[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 01-17249, 01-17251, 01-17253,
01-17255, 01-17256, 01-17257

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 13, 2003
THOMAS K. KAHN
CLERK

Tax Court Docket Nos. 1984-92, 22884-93,
21616-91, 16421-90, 23743-92, 20211-91

CLAUDE M. BALLARD and
MARY B. BALLARD,

Petitioners-Appellants,

versus

COMMISSIONER OF INTERNAL
REVENUE,

Respondent-Appellee.

_____

Appeals from a Decision of
the United States Tax Court

_____

**(February 13, 2003)**

Before HULL, FAY and GIBSON[*], Circuit Judges.

FAY, Circuit Judge:

_____
* Honorable John R. Gibson, United States Circuit Judge for the Eighth Circuit, sitting by
designation.

Petitioners-Appellants Claude M. Ballard ("Ballard") and Mary B. Ballard[1] appeal the judgment of the United States Tax Court in which it found that Ballard fraudulently failed to declare and pay income tax on approximately $3,200,000. The Tax Court determined that Ballard earned the unreported income through a scheme with Burton W. Kanter ("Kanter") and Robert W. Lisle ("Lisle") to sell influence with Prudential Life Insurance Co. of America ("Prudential") whereby suitors of Prudential would pay Kanter kickbacks in exchange for the influence of Ballard and Lisle, senior Prudential employees. After receipt of the kickback proceeds, Kanter would funnel the proceeds of the scheme to Ballard and Lisle through a complex web of corporations, partnerships and trusts designed to shelter the money from the reporting requirements of the Internal Revenue Code. As a result of the Tax Court's findings, Petitioners-Appellants have been assessed tax deficiencies (including penalties against Ballard) totaling $1,318,648.

On appeal, Petitioners-Appellants assert (1) that application of Tax Court Rules of Practice and Procedure Rule ("Rule") 183, which allowed the Tax Court Judge to review the findings of the Special Trial Judge without making the findings of the Special Trial Judge available to the parties, violated their due process rights, and (2) that the evidence adduced at trial is insufficient to support the Tax Court's

---

[1] Mary B. Ballard is a participant in this dispute solely as a result of having filed joint tax returns with her spouse Claude M. Ballard; therefore, unless otherwise specified, all references will be to Claude M. Ballard.

findings. After extensive review of the record and consideration of oral argument, we find that the application of Rule 183 did not violate Petitioners-Appellants' due process rights and that the evidence is sufficient to support the Tax Court's finding that Ballard received and fraudulently failed to report income.

## I. BACKGROUND

A. Facts

The factual underpinning of the case involves allegations by the Internal Revenue Service ("IRS") that Ballard and Lisle sold influence with Prudential's Real Estate Department to would-be Prudential suitors via Kanter, a well-known tax attorney and University of Chicago Law School professor. Ballard worked for Prudential from 1948 until 1981, and Lisle worked for Prudential from 1950 until 1982. Both Ballard and Lisle worked in Prudential's real estate department which was divided into two divisions: equity operations and mortgage operations. During the years of Ballard's and Lisle's employment, Prudential was one of the largest owners of commercial real estate in the United States. Ballard worked in the equity operations division, ultimately becoming the senior vice-president responsible for all operations, acquisitions, sales and portfolio management of Prudential's equity investments in real estate. Ballard's position afforded him great influence over the choice of builders and contractors for Prudential projects

3

and, resultantly, he could influence or prevent a project from going forward. Lisle worked in Prudential's mortgage operations division, ultimately becoming a vice-president and overseeing the lending of money and buying and building of real estate for Prudential. Lisle had the authority to commit any loan up to $20,000,000 and to award construction contracts.

Ballard and Lisle worked out of Prudential's Newark, New Jersey corporate headquarters. In fact, their offices were located next to one another. Further, both Ballard and Lisle worked under Donald Knab ("Knab"), the person in charge of all of Prudential's real estate operations. Knab highly regarded both Ballard's and Lisle's work. Consequently, Ballard and Lisle had great influence with Knab regarding the projects Prudential would pursue.

Ballard and Lisle met Kanter during the early 1970s and they all quickly became personal friends. Thereafter, as the IRS contends, Ballard, Lisle and Kanter proceeded to engage in a scheme whereby Prudential suitors would pay kickbacks to Kanter for securing Prudential business. Because Kanter himself had no influence over Prudential, in order to secure Prudential business, Kanter would rely on Ballard and Lisle. Specifically, the IRS contends that on five separate occasions, arrangements were made to buy Ballard's and Lisle's influence.[2] For

---

[2] Referred to as "the Five," the IRS contends that the Ballard, Lisle, Kanter influence scheme resulted in the receipt of payments from the following five individuals: J.D. Weaver, Bruce Frey, William Schaffel, Kenneth Schnitzer and John Eulich.

each of these arrangements, following the receipt of kickback proceeds, Kanter would funnel the money to Ballard through a complex web of corporations, partnerships and trusts. As alleged by the IRS, Ballard ultimately would receive kickback proceeds through a number of means including deposit of the funds by Kanter into a corporation completely controlled by Ballard, through sham loans by Kanter to Ballard, or through sham consultant payments to Ballard's family members.[3]

As the IRS asserts, in order to facilitate the scheme, Kanter formed Investment Research Associates, Ltd. ("IRA")[4] which acted as the conduit through which all kickback proceeds to Ballard were funneled. IRA itself did not perform any business, had no employees other than bookkeepers and paid no salaries in any years other than minimal amounts from 1979 to 1982. However, IRA did have a controlling interest in various subsidiaries including TMT, Inc. ("TMT"), Carlco, Inc. ("Carlco") and BWK, Inc. ("BWK").[5]

TMT was formed in 1982 and remained inactive until IRA acquired all of its outstanding shares of common stock at the end of 1983. At that time, TMT issued

---

[3] The IRS alleges that a similar method was employed to funnel proceeds of the scheme to Lisle; however, that case is not before us.

[4] Formed in 1979, IRA was originally incorporated as Cedilla Co. in 1974. For purposes of clarity, however, IRA will be used throughout.

[5] According to the IRS, TMT was a subsidiary of IRA that was controlled by Ballard and was the instrument utilized to provide Ballard with his share of the kickback proceeds. Carlco and BWK were subsidiaries controlled by Lisle and Kanter, respectively.

150 preferred shares of stock to Ballard's family trust ("the Orient Trust") and in 1984, TMT issued an additional 150 shares of preferred stock to the Orient Trust. The IRS contends that TMT was the personal pocketbook of Ballard exhibited by Ballard's complete control over TMT and its investment decisions as well as the fact that Ballard and his family had signatory authority over TMT's accounts and that TMT's designated business address was Ballard's personal residence.

By the end of 1983, the IRS contends that IRA had accumulated $4,771,445 in payments related to "the Five" and that in 1984, Kanter directed IRA to distribute the accumulated funds and its interest in the Essex Partnership[6] in a 45-45-10 ratio to TMT, Carlco and BWK, respectively. Additionally, the IRS contends that Ballard received unreported proceeds from the kickback scheme in the form of (1) continued distributions by IRA of Essex Partnership proceeds in the 45-45-10 ratio, (2) distribution in the 45-45-10 ratio of installment payments IRA received in connection with a stock repurchase of Property Management Systems, Inc. ("PMS")[7] held by IRA and (3) continued receipt of a portion of payments related to the San Francisco Hyatt Embarcadero Hotel[8].

[6] According to the IRS, the Essex Partnership was formed by Kanter, John Eulich and others as part of the fifth kickback arrangement of "the Five." As alleged, IRA maintained a 26.125% interest in the partnership.

[7] According to the IRS, the PMS stock repurchase pertains to the fourth kickback arrangement of "the Five."

[8] According to the IRS, the first kickback arrangement involved an agreement between the Hyatt Corp. ("Hyatt") and the KWJ Corp. ("KWJ"), a company controlled by J.D. Weaver ("Weaver"), whereby Hyatt, based on Weaver's relationship with Ballard and Lisle, would pay Weaver part

B.    Procedural History

Petitioners-Appellants received Notices of Deficiency from the IRS

pertaining to years 1975 through 1982, 1984, and 1987 through 1989, alleging that

they owed additional taxes.  As to each deficiency asserted by the IRS, the Ballards

filed petitions for redetermination in the Tax Court.  Pursuant to I.R.C. § 7443A

and Rules 180, 181 and 183, the Chief Judge of the Tax Court assigned the

consolidated case to Special Trial Judge D. Irwin Couvillion for trial.

At the conclusion of the five-week trial during the summer of 1994, Special

Trial Judge Couvillion, in accordance with Rule 183(b), prepared and submitted a

written report containing his findings of facts and opinions to the Chief Judge for

subsequent review by a Tax Court Judge.  In accordance with Rule 183, none of

the litigants received a copy of Special Trial Judge Couvillion's report at that time.

Thereafter, pursuant to Rule 183(b), the Chief Judge assigned the case to Tax

Court Judge H.A. Dawson, Jr. for his review and final disposition.  On December

15, 1999, Judge Dawson issued the opinion of the Tax Court in which the Tax

Court both approved of and adopted Special Trial Judge Couvillion's report (T.C.

Memo 1999-407; *see Investment Research Assoc., Inc. v. Commissioner*, 78

---

of its annual management fee for his assistance in securing Hyatt the management contract for
Prudential's San Francisco Embarcadero Hotel.  Thereafter, IRA obtained a 70% interest in
Weaver's Hyatt payments.  Consistent with the other arrangements, TMT received 45% of the
payments IRA received from Weaver.

T.C.M. (CCH) 951 (1999)), a copy of which was provided to the parties. On July 24, 2001, Judge Dawson entered the final order of the Tax Court against Petitioners-Appellants, assessing tax deficiencies of $1,318,648. Of that amount, $422,812 is penalties against Ballard pursuant to I.R.C. § 6653(b).

On April 20, 2000, prior to the Tax Court's final order of assessment, the Ballards, joined by the other petitioners, filed a motion requesting access to "all reports, draft opinions or similar documents, prepared and delivered to the [Tax] Court pursuant to Rule 183(b)," or, in the alternative, that the Tax Court either certify the issue for interlocutory appeal pursuant to Rule 193 or make the initial findings part of the record for subsequent appeal to the circuit court. On April 26, 2000, Judge Dawson issued an order denying the motion. In the order, Judge Dawson noted that "[he] gave due regard to the fact that Special Trial Judge Couvillion evaluated the credibility of witnesses . . . and treated the findings of fact recommended by the Special Trial Judge as being presumptively correct."[9] On May 26, 2000, the Ballards, along with the other petitioners, filed a second motion with the Tax Court. The second motion requested that Special Trial Judge Couvillion's original report or other documentation be placed under seal and made part of the record for subsequent appellate review. That motion was denied on

---

[9] Rule 183(c) provides in relevant part, "[d]ue regard shall be given to the circumstance that the Special Trial Judge had the opportunity to evaluate the credibility of witnesses, and the findings of fact recommended by the Special Trial Judge shall be presumed to be correct."

8

May 30, 2000.

On August 22, 2000, the Ballards, once again joined by the other petitioners, filed a motion requesting that the Tax Court reconsider its denial of access to Special Trial Judge Couvillion's original report or, alternatively, that the Tax Court grant the petitioners a new trial. In support of this motion, an affidavit from Randall G. Dick ("Dick"), attorney for IRA and for Kanter, was filed. In the affidavit, Dick indicated that two unidentified Tax Court Judges approached him and stated that in the original report submitted to the Chief Judge in accordance with Rule 183(b), Special Trial Judge Couvillion concluded that payments made by "the Five" were not taxable to the individual petitioners and that the fraud penalty was not applicable. Furthermore, Dick indicated that the two unidentified Tax Court Judges expressed that "substantial sections of the opinion were not written by Judge Couvillion, and that those sections containing findings related to the credibility of witnesses and findings related to fraud were wholly contrary to the findings made by Judge Couvillion in his report." According to Dick, the two Tax Court Judges stated that the changes to Special Trial Judge Couvillion's findings relating to credibility and fraud were made by Judge Dawson. Finally, Dick indicated that he confirmed what he was told by the two unidentified Tax Court Judges with yet another unidentified Tax Court Judge. Apparently, the third

9

unidentified Tax Court Judge confirmed that Special Trial Judge Couvillion's opinion had been "changed."  On August 30, 2000, the Tax Court issued an order signed by Special Trial Judge Couvillion, Judge Dawson and the Chief Judge of the Tax Court denying the motion and confirming that, contrary to the contents of the affidavit, the underlying report adopted by the Tax Court is, in fact, Special Trial Judge Couvillion's report.

Subsequently, the Ballards petitioned this court for a writ of mandamus seeking an order directing the Tax Court to provide the Ballards with a copy of the original Special Trial Judge Couvillion report or, alternatively, seeking an order requiring that the Tax Court provide any changes made by Judge Dawson to the original Special Trial Judge Couvillion report.  The petition was denied on October 23, 2000.

## II.   DISCUSSION

This court reviews decisions of the Tax Court "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." *Pugh v. Commissioner*, 213 F.3d 1324, 1325 (11th Cir. 2000) (quoting I.R.C. § 7482(a)(1)).  Additionally, we review Tax Court conclusions of law *de novo* and findings of fact for clear error.  *Davis v. Commissioner*, 210 F.3d 1346, 1347 (11th Cir. 2000).

A.    Due Process

Petitioners-Appellants advance three grounds upon which the application of Rule 183 in this case violated their due process.  First, Petitioners-Appellants assert that the Tax Court is the only trial court that mandates that the fact-finder submit the report of findings of fact and opinion to the court for adoption, modification or rejection before making the report available to the litigants.[10]  Second, Petitioners-Appellants assert that the Tax Court's abrogation of the universally followed procedure of making known the fact-finder's report prior to any modification raises a presumption of a denial of due process.  Petitioners-Appellants' final argument can be further divided into two subparts.  First, they assert that although the findings of the Special Trial Judge are entitled to deference under Rule 183, as a result of not making the Special Trial Judge's report available, it is impossible to evaluate the actions of the reviewing Tax Judge thus violating Petitioners-Appellants' due process.  Second, they assert that meaningful review of the Tax Court's actions by this court is not possible absent inclusion of the Special Trial Judge's original report in the record.

Although articulated separately, at the basic level, Petitioners-Appellants' arguments make two points: (1) since the Special Trial Judge is the only official of

---

[10]  Petitioners-Appellants contrast the procedures employed by the Tax Court pursuant to Rule 183 with the procedures utilized by Magistrate Judges, Administrative Law Judges and Special Masters.  However, for the reasons stated, we find the comparisons to be unavailing.

11

the Tax Court to hear the presentation of evidence, the Tax Court should not be permitted to reach a conclusion contrary to the Special Trial Judge without re-hearing the evidence and/or an providing the parties an opportunity to be heard; and (2) because the Special Trial Judge's report is not included as part of the record, there can be no meaningful review of the Tax Court's actions per Rule 183(c). Because Petitioners-Appellants' arguments rely upon the same faulty premise, this court will address them jointly.

In short, Petitioners-Appellants' arguments are premised upon the assertion that the underlying report adopted by the Tax Court is not, in fact, Special Trial Judge Couvillion's report. Were that to be the case, we, too, would have significant concerns over the propriety of the process employed in this case. However, contrary to Petitioners-Appellants' assertions, the record as presented to us clearly reveals that the report adopted by the Tax Court is Special Trial Judge Couvillion's report. This critical fact is exhibited in the August 30, 2000 Order signed by Special Trial Judge Couvillion, Judge Dawson and the Chief Judge of the Tax Court. Consequently, Petitioners-Appellants' arguments are simply without merit.[11]

---

[11] By innuendo, counsel seem to imply that some improper motive caused these alleged changes in Special Trial Judge Couvillion's original report as compared to the final opinion of the Tax Court. (Appellants' Br. at 5). If Petitioners-Appellants believe that a Tax Court Judge has engaged in neglect of duty or malfeasance in office, this court refers Petitioners-Appellants to I.R.C. § 7443(f) as the appropriate manner by which to address such a circumstance.

12

Even assuming Dick's affidavit to be true and affording Petitioners-Appellants all reasonable inferences, the process utilized in this case does not give rise to due process concern. While the procedures used in the Tax Court may be unique to that court, there is nothing unusual about judges conferring with one another about cases assigned to them. These conferences are an essential part of the judicial process when, by statute, more than one judge is charged with the responsibility of deciding the case. And, as a result of such conferences, judges sometimes change their original position or thoughts. Whether Special Trial Judge Couvillion prepared drafts of his report or subsequently changed his opinion entirely is without import insofar as our analysis of the alleged due process violation pertaining to the application of Rule 183 is concerned. Despite the invitation, this court will simply not interfere with another court's deliberative process.

The record reveals, and we accept as true, that the underlying report adopted by the Tax Court is Special Trial Judge Couvillion's. Petitioners-Appellants have not demonstrated that the Order of August 30, 2000 is inaccurate or suspect in any manner. Therefore, we conclude that the application of Rule 183 in this case did not violate Petitioners-Appellants' due process rights. Accordingly, we deny the request for relief and save for another day the more troubling question of what

13

would have occurred had Special Trial Judge Couvillion not indicated that the report adopted by the Tax Court accurately reflected his findings and opinion.

B.     Sufficiency of the Evidence

To sustain its fraud determination, the Tax Court found that the evidence clearly and convincingly demonstrated that Ballard received income resulting from transactions with "the Five" and attempted to evade the payment of taxes on that income through conduct designed to conceal, mislead, or otherwise prevent the collection of the appropriate taxes due.  The Tax Court's fraud determination was based on: (1) Ballard's business acumen and understanding and appreciation of appropriate tax reporting; (2) Ballard's substantial and consistent failure to report approximately $3,200,000 in earned income related to "the Five" over a twelve year period;[12] (3) Ballard's failure to cooperate with the IRS during its audit; (4) Ballard's failure to maintain complete and accurate records pertaining to "the Five"; (5) Ballard's use of a large number of Kanter entities designed for no purpose other than to confuse and disguise income from "the Five"; and (6) Ballard's false and misleading testimony to the Tax Court.

In response, Petitioners-Appellants argue that the evidence is insufficient to

---

[12]  The Tax Court determined that approximately $1,000,000 of additional income was earned by Ballard related to "the Five."  However, the IRS did not issue notices of deficiencies for the relevant years in which the income was earned, therefore, the Tax Court did not have jurisdiction to determine whether or not the tax related to that income had been underpaid.  *See* I.R.C. § 6214(b).

14

support the Tax Court's finding that Ballard received and fraudulently failed to report income. Petitioners-Appellants advance a number of reasons why we should overrule the Tax Court, however, the question before us is not whether there are strong arguments against the findings of the Tax Court. Rather, the question before us is whether the Tax Court's findings are "clearly erroneous." *See Comm'r v. Duberstein*, 363 U.S. 278, 291, 80 S. Ct. 1190, 1200, 4 L. Ed. 2d 1218, 1228 (1960); *Korecky v. Comm'r*, 781 F.2d 1566, 1568 (11th Cir. 1986) (citing *Marsellus v. Commissioner*, 544 F.2d 883, 885 (5th Cir. 1977); *Webb v. Commissioner*, 394 F.2d 366, 378 (5th Cir. 1968)).[13] "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *University of Georgia Athletic Assoc. v. Laite*, 756 F.2d 1535, 1543 (11th Cir. 1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 542, 92 L. Ed. 746 (1948)).

Based upon our careful review of the record and consideration of oral argument, we are not left with "a definite and firm conviction that a mistake has been committed." When the conduct of the parties and flow of money is examined in this case, there is strong support for the Tax Court's conclusion that Ballard

---

[13] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), this court adopted as precedent all decisions of the former Fifth Circuit Court of Appeals decided prior to October 1, 1981.

earned and received income related to "the Five." The record supports the Tax Court's conclusion that Ballard, Lisle and Kanter entered into an agreement to split proceeds from "the Five" in a 45-45-10 ratio and that Ballard ultimately received his share of those proceeds via direct distributions to TMT, through sham loans by Kanter to Ballard, or through sham consultant payments to Ballard's family members. Furthermore, the Tax Court's fraud determination is strongly supported by the record. While no single indicia of fraud present in this case is determinative, the number and combination of those indicia leave us with an abiding belief that the Tax Court did not clearly err in its fraud determination.

Illustrative of our conclusion is the first of "the Five" transactions involving Weaver and the Embarcadero Hotel in San Francisco, California. Ballard first met Weaver in the late 1960s as a product of joint involvement in the development of the Houston Hyatt Hotel. Thereafter, in the early 1970s, Prudential became involved in a joint venture to build the San Francisco Embarcadero Hotel. The joint venture sought an experienced hotel management company to operate the Embarcadero Hotel and, as it so happened, Lisle was participating in the selection of the hotel management company.

A.N. Pritzker ("Pritzker"), one of Kanter's clients and then Hyatt Corp. ("Hyatt") president, was interested in securing the property management contract

16

on the San Francisco Embarcadero Hotel. Lisle, however, was initially not interested in having Hyatt manage the San Francisco Embarcadero Hotel and was not going to allow Hyatt to bid on the contract. Pritzker was determined to win the management contract for Hyatt and offered to pay Weaver if he, through his connection with Ballard and Lisle, could secure the management contract for Hyatt. Through Weaver's efforts, Hyatt was authorized to bid on the management contract. Ballard was tasked with evaluating the various proposals submitted and, as it turns out, Hyatt was ultimately awarded the property management contract during a meeting attended by both Ballard and Lisle.

In acknowledgement of Weaver's assistance in securing for Hyatt the San Francisco Embarcadero Hotel management contract, Hyatt entered into an agreement with KWJ (Weaver's corporation) to pay Weaver 10% of its fees on the management contract. The hotel opened in May of 1973. Thereafter, the record reflects Weaver received payments equal to 10% of the fees Hyatt received on the management contract.[14]

---

[14] Although not all operating years are within the Tax Court's jurisdiction, the record supports that Hyatt made the following payments to KWJ:

| Operating Year | Payment Year | Payment |
| --- | --- | --- |
| 1973 | 1974 | -- |
| 1974 | 1975 | -- |
| 1975 | 1976 | -- |
| 1976 | 1977 | $ 54,848 |
| 1977 | 1978 | $ 60,739 |
| 1978 | 1979 | -- |

In 1976, IRA (Kanter's corporation) entered into an agreement to purchase 100% of KWJ's stock. Although the Hyatt agreement was worth millions to Weaver, Weaver agreed to sell his rights in KWJ to IRA for $150,000 plus 30% of future Hyatt Payments.[15] During the time Kanter and Weaver were solidifying their deal, Hyatt was in the process of becoming privately owned. Kanter did not want the transfer of the KWJ stock to take place until after Hyatt became privately owned, therefore, Kanter's deal with Weaver was framed as a four-year option to buy Weaver's KWJ stock which allowed for IRA to non-publicly purchase the KWJ shares.

In 1979, following Hyatt becoming privately owned, IRA exercised its

| | | |
|---|---|---|
| 1979 | 1980 | $171,027 |
| 1980 | 1981 | $128,671 |
| 1981 | 1982 | $246,717 |
| 1982 | 1983 | $245,843 |

In 1983, unbeknownst to Hyatt, KWJ Corp. liquidated and distributed its assets to IRA. In 1984, IRA's subsidiaries TMT, Carlco, and BWK formed the dubiously named KWJ Co. partnership in which TMT (i.e., Ballard) and Carlco (i.e., Lisle) each had a 45% interest and BWK (i.e., Kanter) a 10% interest. Thereafter, the KWJ Co. partnership received the following payments:

| | | |
|---|---|---|
| 1983 | 1984 | – |
| 1984 | 1985 | $295,415 |
| 1985 | 1986 | $330,376 |
| 1986 | 1987 | $327,784 |
| 1987 | 1988 | $281,926 |
| 1988 | 1989 | $ 75,396 |
| 1989 | 1990 | $ 24,340 |

[15] In effect, Weaver was giving up 70% of his Hyatt payments for $150,000.

option to purchase the KWJ shares.[16] At that time, IRA obtained a net 70%

ownership interest in the future Hyatt payments as well as KWJ's net worth of

$115,084. Hyatt was not informed of the Weaver-Kanter deal and continued to

send the annual payments to Weaver.[17] Upon receipt of payments from Hyatt,

Weaver would forward the check to IRA which, either through KWJ or the KWJ

Co. partnership, would then "kickback" Weaver's 30% and deduct the payment as

a commission expense. On one occasion, relied heavily upon by the Tax Court in

support of its finding of an agreement to split the Hyatt payments between Ballard,

Lisle and Kanter, Weaver forwarded the annual Hyatt payment with a letter

requesting that Kanter deposit the check and "issue appropriate checks to the

participants."[18]

The record supports that a portion of the proceeds from the Hyatt contract,

as with other proceeds related to "the Five," were ultimately distributed to Ballard

through a number of means including direct distributions to TMT, through sham

---

[16] The Kanter-Weaver deal provided for an initial payment of $10,000 by IRA for the KWJ stock. The remaining $140,000 purchase price was to be paid by August of 1980. Since Hyatt paid KWJ $171,027 for the 1979 operating year, IRA simply utilized what otherwise would have gone to Weaver to pay off the remaining balance owed. Thus, IRA assumed ownership of KWJ and the multi-million dollar contract with Hyatt for little to no out-of-pocket money.

[17] As stated above, in 1983, unbeknownst to Hyatt, KWJ Corp. liquidated and its assets were distributed to IRA. Thereafter, IRA subsidiaries TMT (i.e., Ballard), Carlco (i.e., Lisle) and BWK (i.e., Kanter) formed the KWJ Co. partnership and continued to receive the Hyatt payments.

[18] The Tax Court concluded and we concur that "the participants" is reference to Ballard and Lisle.

19

loans by Kanter and various Kanter entities to Ballard, or through sham consultant payments to Ballard's family members. Thus, we agree with the Tax Court that if one follows the circuitous and sometimes obfuscated flow of money for each of "the Five," inevitably, Ballard receives 45% of the proceeds his efforts helped to procure and for which he failed to properly report and pay taxes.

## III. CONCLUSION

The decision of the Tax Court is affirmed.

AFFIRMED.