# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 25, 2008

Charles R. Fulbruge III
Clerk

No. 07-60862
(Consolidated with 07-60863 and 07-60864)

ESTATE OF ROBERT W. LISLE, Deceased; ESTATE OF DONNA M. LISLE, Deceased

Petitioners-Appellants,

THOMAS W LISLE, Independent Co-Executor; AMY L. ALBRECHT, Independent Co-Executor,

Appellants

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

Appeals from a Decision of
the United States Tax Court

Before HIGGINBOTHAM, DAVIS and BARKSDALE, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

This case returns to this court for the second time for review of the Tax Court's judgment that taxpayers Robert W. Lisle and his wife Donna M. Lisle[1] failed to declare and pay income tax on approximately $1,280,000 in revenue

---

[1] Donna M. Lisle, and her estate, is a participant in this dispute solely as a result of having filed joint tax returns with Robert W. Lisle.

earned as a result of Robert Lisle's relationship with a series of real estate deals and related transactions. See Estate of Robert W. Lisle v. Comm'r, 341 F.3d 364 (5th Cir. 2003)(Lisle I). In this appeal, like the first, the Tax Court found that Robert W. Lisle, along with Claude M. Ballard and Burton W. Kanter, earned the unreported income through an elaborate kickback scheme involving the sale of influence by Lisle and Ballard through their positions in the Real Estate Department at Prudential Life Insurance Co. of America. The Commissioner asserted that Kanter kicked back commissions he or his corporation earned to Lisle and Ballard in return for their influence. The unreported revenue allegedly arose from five arrangements, sometimes called "the Five," made between Kanter and (1) J.D. Weaver (also called the Hyatt-Embarcadero transaction), (2) Bruce Frey, (3) William Schaffel, (4) Kenneth Schnitzer, and (5) John Eulich (also called the Essex transaction).[2] In each instance, Kanter dealt with clients who were seeking to do business with Prudential. Two of the deals involved hotel management contracts, another a property management contract, another involved the conversion of apartment complexes to condominiums, and still another involved assistance with selling and financing real estate transactions. The Tax Court further found that the kickbacks were distributed among Lisle, Ballard and Kanter in a 45-45-10 percent split through numerous transactions involving various corporations and trusts, favorable loans, and payments to Lisle's children.

In this appeal, unlike the first, we have the benefit of the fact findings and conclusions of the Special Trial Judge that were rejected by the Tax Court and obscured in the first appeal. With the benefit of a complete record, our equivocal findings in the first appeal, and the findings of the Eleventh Circuit in the appeal of the related case affecting taxpayer Ballard, Ballard v. Comm'r, 522

---

[2] For a detailed description of the Five, see Lisle I.

F.3d 1229 (11th Cir. 2008)(Ballard III), we conclude that the Tax Court reviewing the report of the Special Trial Judge failed to give due regard to the factfindings of the trial judge and erred in issuing a judgment contrary to those findings. Accordingly, for the reasons set forth below, we vacate the Tax Court's judgment as to the Lisles and remand with instructions to issue a final order adopting the Special Trial Judge's report.

I.

The cases for income tax deficiencies against Lisle, Ballard and Kanter were consolidated in the Tax Court. In the Lisle case that proceeded through this circuit, the Tax Court ruled that the taxpayers fraudulently failed to declare and pay income tax on approximately $1,280,000 of income. In Lisle I, this court reversed the Tax Court's finding of fraud, affirmed the Tax Court's ruling sustaining the assessment of a deficiency for years 1987, 1988 and 1989, and remanded the case to the Tax Court for the limited purposes of recalculating the deficiencies and additions to the tax consistent with the opinion. Lisle I. The Supreme Court later granted certiorari in two related cases from the Seventh and Eleventh Circuits (Ballard v. Comm'r, 321 F.3d 1037 (11th Cir. 2003)(Ballard I), and Estate of Kanter v. Comm'r, 337 F.3d 833 (7th Cir. 2003)) and reversed. Ballard v. Comm'r of Internal Revenue, 541 U.S. 1009 (2004) and 544 U.S. 40 (2005). As we explain below, the basis for the Supreme Court's reversal was the failure of the Tax Court to follow proper procedure.

In the Tax Court, prior to the first appeal to this circuit, the Chief Judge of the Tax Court had assigned the consolidated case to Special Trial Judge D. Irwin Couvillion for trial. Judge Couvillion presided over a five-week trial in the summer of 1994. Around September 1998, Judge Couvillion submitted a 303 page written report containing his findings of facts and opinions to the Chief Judge for subsequent review by a Tax Court Judge. The parties were not

provided a copy of Judge Couvillion's report. The Chief Judge assigned the case to Tax Court Judge H.A. Dawson, Jr. for his review and final disposition. On December 15, 1999, Judge Dawson issued the opinion of the Tax Court. (T.C. Memo 1999-407; see Investment Research Assocs. Ltd. v. Commissioner, T.C. Memo 1999-407, 1999 Tax Ct. Memo LEXIS 463, 78 T.C.M. (CCH) 951 (1999)). Judge Dawson found that Ballard, Kanter and Lisle had acted with intent to deceive the Commissioner and held them liable for underpaid taxes and substantial fraud penalties. Judge Dawson's opinion purported to adopt the findings contained in the report submitted by Judge Couvillion. But we now know that this was not entirely accurate.

As stated by the Eleventh Circuit:

We now know, based on new documents filed with this Court, that the following events occurred in the Tax Court:

1. Judge Couvillion's original report initially recommended that Ballard [nor Kanter or Lisle] was not liable for the deficiencies in tax asserted against him. Specifically, Judge Couvillion concluded that "there were no 'kickback schemes,' and none of the alleged 'kickback schemes' payments by 'The Five' represented unreported income of Kanter, Ballard, and Lisle. There was, therefore, no underpayment of tax." In fact, Judge Couvillion's original report did not consider the government's allegation of fraud "as even rising to the level of suspicion of fraud."

2. After Judge Dawson was assigned to the case, he reviewed Judge Couvillion's original report and advised the Chief Judge that he disagreed with it. Approximately one week later, on or about August 27, 1998, then Chief Judge Cohen advised Judge Dawson that she also disagreed with Judge Couvillion's original report.

3. A conference was scheduled between Chief Judge Cohen, Judge Dawson, and Judge Couvillion. It appears that shortly before this conference was to take place, Judge Couvillion was aware that both Chief Judge Cohen and Judge Dawson disagreed with his report.

4

4. On September 1, 1998, Judge Couvillion withdrew his original report.

5. Chief Judge Cohen assigned Judge Dawson and Judge Couvillion to write a "collaborative report." This "collaborative report" stood in stark contrast to Judge Couvillion's original report. In fact, the collaborative report now concluded that Ballard [as well as Kanter and Lisle] should be liable for the deficiencies in tax asserted against him.

6. On October 25, 1999, Judge Dawson adopted the "new collaborative report."

7. On November 4, 1999, Chief Judge Cohen adopted the "new collaborative report" with some minor modifications.

8. On December 15, 1999, Chief Judge Cohen formally assigned the case to Judge Dawson, and the "new collaborative report" was filed as the decision of the Tax Court.

Ballard v. Comm'r, 429 F.3d 1026, 1029 (11th Cir. 2005)(Ballard II) .

The taxpayers suspected that the document labeled Opinion of the Special Trial Judge was not in fact Judge Couvillion's original ruling. They filed motions in the Tax Court seeking access to Judge Couvillion's original ruling, which motions were denied. The taxpayers appealed to their respective circuit courts, including this court, all of which treated Judge Dawson's opinion as the Opinion of the Special Trial Judge. Kanter and Ballard appealed to the Supreme Court which granted certiorari to resolve the question whether the Tax Court may exclude from the record on appeal Rule 183(b) reports submitted by special trial judges.

The Supreme Court held that Tax Court Rule 183 did not describe or authorize the collaborative effort with regard to the trial judge's opinion and the Tax Court was not authorized to exclude from the record on appeal reports by special trial judges pursuant to Rule 183(b). Rule 183 further requires the Tax Court Judge to give due regard "to the circumstance that the Special Trial Judge

had the opportunity to evaluate the credibility of witnesses, and the findings of fact recommended by the Special Trial Judge shall be presumed to be correct." Tax Court Rule 183(c)(2000 ed.), as cited in Ballard, 544 U.S. at 53. Appellate review is impeded and the standards are meaningless when the Tax Court judge collaborates in the special trial judge's opinion. The Supreme Court reversed the judgments affirming the Tax Court judgments which were rendered without giving proper deference to the trial judge's findings and the cases were remanded for further proceedings. Ballard, 544 U.S. at 65.

In response to the Supreme Court's opinion, this court recalled its mandate and remanded the case to the Tax Court with orders to:

> (1) Strike the "collaborative report" that formed the basis of the Tax Court's ultimate decision; (2) reinstate Judge Couvillion's original report; (3) refer this case to a regular Tax Court judge who had no involvement in the preparation of the aforementioned "collaborative report" and who shall give "due regard" to the credibility determinations of Judge Couvillion, presuming that his fact findings are correct unless manifestly unreasonable[, in dealing with the remaining issues of tax deficiency]; and (4) Adhere strictly hereafter to the amended Tax Court Rule in finalizing Tax Court opinions.

Estate of Robert W. Lisle v. Comm'r, 431 F.3d 439, 439-40 (5th Cir. 2005) (Lisle II), adopting the Eleventh Circuit's approach on remand in Ballard II, 429 F.3d at 1032.

On remand, the Tax Court assigned the case to Judge Haines. He adopted some of the Special Trial Judge's findings, rejected other recommended findings and credibility determinations as manifestly unreasonable and supplemented other recommended findings because he viewed them as incomplete. Judge Haines concluded that Lisle was liable for income tax deficiencies. Our remand in Lisle II did not disturb this court's decision to reverse the imposition of fraud penalties against Lisle, so the fraud issue is no longer part of this case. Lisle now appeals the Tax Court's judgment which it rendered following our remand.

II.

Lisle argues first that the Tax Court failed to give appropriate deference to the findings of the Special Trial Judge. The Tax Court's review of the opinion of the Special Trial Judge is restricted by Rule 183. In reviewing the report "Due regard shall be given to the circumstance that the Special Trial Judge had the opportunity to evaluate the credibility of witnesses, and the findings of fact recommended by the Special Trial Judge shall be presumed to be correct." Ballard, 544 U.S. at 53. The government asserts that because the Special Trial Judge has no authority to decide the case, it is the Tax Court Judge who must decide the case. Thus, according to the government, just as the Tax Court's factual findings are generally reviewed for clear error, so too should the Tax Court's rejection of the Special Trial Judge's findings of fact and credibility determination be reviewed for clear error.

Lisle argues that our focus should be on whether the findings of the Special Trial Judge are supported by the record. We agree. As stated by the Eleventh Circuit in its opinion in the parallel case affecting taxpayer Ballard,

> After the Tax Court Judge has conducted his review and issued a final opinion, we generally review this opinion for clear error. See Stone, 865 F.2d at 344; 26 U.S.C. § 7482(a)(1) (instructing Courts of Appeals to review Tax Court decisions in the same manner as district court decisions on civil cases tried without a jury); Fed.R.Civ.P. 52(a)(6) (instructing that Courts of Appeals can set aside the district court's findings on cases tried without a jury if they are clearly erroneous). However, when the Tax Court Judge rejects the Special Trial Judge's findings and we are faced with a conflicting report and opinion, we determine whether the Tax Court Judge committed clear error by rejecting the Special Trial Judge's findings as clearly erroneous by reviewing the Special Trial Judge's report to determine if his findings were, indeed, without record support. Matter of Multiponics, Inc., 622 F.2d 709, 712-13, 722 (5th Cir. 1980) (applying Rule 52(a) to bankruptcy proceedings, wherein the district court rejected the Special Master's findings, and holding

7

that "we must review the findings of the Special Master and may affirm the [d]istrict [c]ourt's reversal only if we also deem the Master's findings clearly erroneous").

Ballard III, 522 F.3d at 1235 (footnotes omitted).  Wright & Miller state the general rule regarding appellate review when the district court has rejected the special master's findings as follows:  "The more common view is that it is the findings of the master that are then measured by the 'clearly erroneous' test." 9C Charles Wright & Arthur Miller, Federal Practice and Procedure § 2584 (3d ed. 2008).  In Bazemore v. Stehling, 396 F.2d 701 (5th Cir. 1968), we considered the analogous standard of review we apply when reviewing the judgment of a district court which in turn reviewed the findings of a bankruptcy referee.  First, the referee in a bankruptcy case must set forth his findings of fact and conclusions of law. Id. at 702.  For the court of appeals to review the findings of the district judge, accepting or rejecting the referee's findings, this court must examine the evidence to determine not whether the district court's findings were clearly erroneous, but whether the findings of the referee were.  Id. at 703.  If the findings of the referee were not clearly erroneous, the district judge was bound to accept them. Id.

This court adopted the position of the Eleventh Circuit that the Tax Court Judge may disturb the Special Trial Judge's findings of fact and credibility determinations only if they are "manifestly unreasonable."  Lisle II, 431 F.3d at 440 (in order remanding this case to the Tax Court), citing Ballard, 429 F.3d at 1031 and 1032.

According to the Supreme Court,

[The clear error] standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The

> reviewing court oversteps the bounds of its duty . . . if it undertakes to duplicate the role of the lower court. In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo. If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

Anderson v. Bessemer City, 470 U.S. 564, 573-74, 105 S. Ct. 1504, 1511-12, 85 L. Ed. 2d 518 (1985) (internal quotation and citation omitted). Further,

> when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

Id. at 575, 105 S. Ct. at 1512. A trial judge's credibility determinations are due this extra deference because "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Id. For these reasons, we agree with the taxpayer that the Tax Court did not give the required deference to the findings of the Special Trial Judge. Applying the correct standard of review, we turn now to review the Special Trial Judge's Report.

III.

We are aided at this stage by this court's prior decision in this case and by the decision of the Eleventh Circuit reviewing the same and findings with respect to a different taxpayer, Ballard, who like Lisle was an executive at Prudential. At the outset, it is important to note that when this court affirmed the original decision of the Tax Court and found that Lisle was liable for the tax deficiencies, we found that "much of the evidence is equivocal" and concluded

9

that "when the burden of proof is by a preponderance of the evidence, we will not find clear error if the evidence supports either of two theories." Lisle, 341 F.3d at 383. Since in Lisle I this court understood that the Special Trial Judge had made critical fact findings against the taxpayers, the balance tipped in favor of affirming the deficiencies. However, now that we know that the trier of fact actually found in favor of the taxpayers, that equivocal evidence is insufficient to overturn the Special Trial Judge's findings.

The Special Trial Judge's findings have also been upheld by the Eleventh Circuit in the related case against taxpayer Ballard. Ballard v. Comm'r, 522 F.3d 1229 (11th Cir. 2008)(Ballard III). That ruling is relevant to this case against Lisle because the deficiencies imposed by the Tax Court against Ballard result from the same findings involving the same Five transactions relied on for the deficiencies against Lisle. Also, the government's theory against Ballard and Lisle was identical: that both Ballard and Lisle, while they were executives at Prudential, sold their influence in return for kickbacks that generated the alleged unreported income. The Eleventh Circuit concluded

> that Judge Couvillion's findings of fact and credibility determinations were supported by the record and that his finding that Ballard was not responsible for a deficiency and had not committed fraud were not manifestly unreasonable. We conclude that, in finding otherwise, Judge Haines did not presume Judge Couvillion's findings to be correct or give Judge Couvillion's credibility determinations their due deference. See Tax Court Rule 183. Rather Judge Haines conducted a nearly de novo review of the facts. This review violated Rule 183's and our instructions. See Anderson, 470 U.S. at 573-74, 105 S.Ct.at 1511-12. It is clear that this case is a "close call." Had Judge Haines been the original trial judge, his rulings would probably be entitled to affirmance. However, he was not the trial judge and did not see or hear the witnesses. Judge Couvillion did and found them credible. It is no surprise that a knowledgeable tax attorney would use numerous legal entities to accomplish different objectives. This does not make

them illegitimate. Unfortunately such "maneuvering" is apparently encouraged by our present tax laws and code. Judge Couvillion heard the witnesses and reviewed the exhibits and concluded the government simply failed to prove such by clear and convincing evidence. The record fully supports his findings of fact and conclusions. Accordingly, we remand to the Tax Court with instructions to vacate Judge Haines' opinion and enter an order approving and adopting Judge Couvillion's original report as the opinion of the Tax Court.

Id. at 1254-55. Following our own independent review of the record, we agree with the conclusion of the Eleventh Circuit in Ballard with respect to taxpayer Lisle.

IV.

We will address one additional argument raised by the Commissioner. The Commissioner faults the Special Trial Judge and the Eleventh Circuit for glossing over its flow of funds argument, particularly for their conclusion that once it was determined that no kickbacks occurred in connection with the transactions, the flow of funds need not be examined. The Commissioner argues that the transactions cannot be properly analyzed without taking the money flow into account. The Commissioner also argues that the documentary evidence of the flow of funds supports the Tax Court's rejection of the Special Trial Judge's credibility determinations in favor of the taxpayers.

As described in Lisle I,

Kanter established a number of corporations, partnerships, and trusts allegedly to receive, distribute, and disguise illegal kickbacks from five business arrangements at issue here. These five transactions and their principal participants are referred to by the parties and the Tax Court as "the Five."

Most of the payments in this case initially were made through Investment Research Associates, Inc. (IRA), which Kanter incorporated in Delaware.

11

Lisle I, 341 F.3d at 370. Kanter controlled IRA. All of the payments from the Five to IRA were reported on IRA's federal income tax returns.

> [IRA] owned controlling interests in several subsidiary corporations including Carlco, Inc., TMT, Inc., and BWK, Inc. As we will discuss, in 1983, IRA distributed all of its assets to Carlco, TMT, and BWK in a 45-45-10 percent split, which were thereafter managed respectively by Lisle, Ballard, and Kanter. The government asserts that forty-five percent of the payments from the Five to Kanter corporations were distributed to Lisle based on this arrangement.

Id. In sum, the Commissioner proceeded on a theory that the payments described above from the Kanter controlled corporation, IRA, to a subsidiary, Carlco, which Lisle managed, were kickbacks that Kanter was paying to Lisle for influencing action by Prudential.

First, we agree with the Eleventh Circuit that Judge Couvillion did not clearly err in declining to further analyze the Commissioner's flow of funds argument after he determined that no kickbacks occurred and thus Ballard, like Lisle, had not earned income from kickbacks from the Five transactions. If there was no kickback scheme that generated income to Lisle, there was no relevant money flow to follow. Ballard III, 522 F.3d at 1253.

The fact that Kanter transferred money from IRA to Carlco, which entity and funds were under the management of Lisle, does not establish that Lisle earned that money. In Lisle I, we found the "assertion that Lisle was the true earner of forty-five percent of the payments because he received forty-five percent of the proceeds, and therefore we will assign forty-five percent of the proceeds to Lisle because he earned them [to be] circular." 341 F.3d at 380. Rather we questioned whether there was any evidence of Lisle actually receiving any of the payments which the Five made to Kanter, based on the evidence the government relied on: Lisle's management of the assets of Carlco, the payment

of consulting fees to Lisle's children; and the loans to Lisle and the trusts which benefitted Lisle's family.  Id. at 381.

We rejected the argument that Carlco was Lisle's alter ego.  Id. at 378.  As to the payments to Lisle's children, we found that "there is no evidence of Lisle's involvement in authorizing them," and also questioned whether the payments to Lisle's children from the Weaver deal (one of the Five) supported the Commissioner's position that Lisle was funneling money to his children.

> It is true that Kanter, Ballard, and Lisle could have had an arrangement to split the funds from the Weaver deal, and accomplished this by funneling some of the money through KWJ to Lisle and Ballard's children. Alternatively, it is also possible that Kanter hired the children of a close family friend who both had some real estate experience to bring potential real estate investments to his attention. In fact, one of Lisle's children was otherwise employed full-time by Kanter. The question is whether the evidence supports the conclusion that Lisle was funneling money from the Weaver deal to his children.

> When the Weaver transaction is examined closely, the evidence is far from clear that Lisle and Ballard were receiving kickbacks laundered through Kanter to their children. First, one must assume that Ballard and Lisle agreed with Weaver to split the commission, and that after meeting Kanter, decided to use him to help launder the money years later. Weaver received a commission from Hyatt for his help in getting Hyatt the Embarcadero contract in 1970 or 1971. Ballard and Lisle did not meet Kanter until 1972. The agreement between Kanter and Weaver for the purchase of the Hyatt commission payments through the purchase of KWJ corporation was not reached until 1976, and the purchase did not take place until 1979. The funds from commission payments were not disbursed to Carlco, TMT, and BWK until 1983, although small payments to Lisle's and Ballard's children began in 1982. If Lisle had agreed to sell his influence to Weaver for a cut of the commission Weaver received from Hyatt, it is not credible that he would rely on a deal formulated years later by Kanter, a man he did not even know at the time he allegedly sold his influence to Weaver.

And if the commission paid to KWJ belonged to Lisle, Ballard, and Kanter in a 45-45-10 split, there is no explanation for why KWJ made payments to the children which were not in proportion to this split. There may be some overarching rationalization for these inconsistencies, but we have not discerned it.

Id. at 381-382. Regarding the loans, we noted:

The government does not explain how these loans can be characterized as kickbacks when they began before the Five ever made any payments to Kanter's corporations. In fact, many of the largest loans to the Ballard and Lisle family trusts occurred before the first payment by a member of the Five in 1977. Of the $ 220,000 loaned to Lisle and his family's trusts over the sixteen years cited by the court, $ 68,000 was loaned before 1977. While this does not mean that later loans were not distributions of income from the Five, it casts serious doubt on that conclusion.

Id. at 382. We therefore disagree with the Commissioner that the flow of funds evidence provides such persuasive proof of the existence of a kickback scheme that Judge Couvillion's contrary finding must be overturned.

The Eleventh Circuit made a similar finding as to taxpayer Ballard.

We nonetheless note that Judge Haines's thorough treatment of the flow-of-funds argument does not convince us that Judge Couvillion's finding concerning the scheme was manifestly unreasonable. The fact that Kanter transferred to TMT, Carlco, and BWK money received from the Five does not necessarily show that Ballard and Lisle earned that money. A finding that Ballard was the true earner of 45% of the payments because his corporation ultimately received 45% of the payments is circular. Likewise, Judge Haines's attack on Kanter's explanation for the allocation involves leaps of logic. Although Judge Haines accurately stated that Kanter's reasoning that Carlco's investment might imperil IRA's deductions did not apply to TMT or BWK, this does not necessitate a conclusion that TMT, Carlco, and BWK were the parties' alter egos. Rather, Kanter may have wished for TMT, Carlco, and BWK to maintain similar tax status. He was an acknowledged expert in our tax laws. Also,

although Judge Haines accurately noted that all of the money allocated per the 45% -45% -10% split was traceable to the Five and that IRA had other money that was not allocated, this does not necessitate a finding that the allocation was a method of getting kickback income to anyone. Rather, Kanter simply may have chosen one of its sources of income to fund the allocation. In sum, Judge Haines attributed too much to these facts.

Ballard v. Comm'r, 522 F.3d 1229, 1254 (11th Cir. 2008). The evidence relied on by the Commissioner and the Tax Court is inadequate to overcome the presumption of correctness that accompanies the findings of the Special Trial Judge.

V.

For the reasons stated above, we vacate the judgment of the Tax Court and remand this case to the Tax Court with instructions to enter an order adopting Judge Couvillion's original report as the opinion of the Tax Court and to enter judgment consistent with that report and this opinion.

VACATED and REMANDED.